UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILMINGTON TRUST, N.A.,
as successor to Wilmington Trust Retirement
and Institutional Services Company,

               Plaintiff,

      -against-

STOUT RISIUS ROSS, INC.,

               Defendant.

No. 1:20-cv-02505-LLS-KHP

**COMPLAINT**

Plaintiff Wilmington Trust, N.A., successor to Wilmington Trust Retirement and Institutional Services Company ("Wilmington"), by its attorneys, for its complaint against Defendant Stout Risius Ross, Inc. ("Stout"), alleges as follows:

## NATURE OF THE DISPUTE

1.     In 2013, Constellis Group, Inc. ("Constellis" or the "Company") decided to sponsor an Employee Stock Ownership Plan (the "ESOP"). Wilmington served as the ESOP's trustee.

2.     Wilmington, as trustee, engaged Stout to provide financial-advisory and valuation services.

3.     The contract between Wilmington and Stout, effective October 25, 2013 (the "Agreement"), provided that Stout would, among other things, render a written opinion advising whether the consideration to be paid by the ESOP for its shares of Constellis stock was not greater than the shares' fair-market value, as that term is defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

4.     Stout also promised to render its services with reasonable care in a professional, diligent, and competent manner, and assured Wilmington that it could rely on Stout's opinions.

5.      On December 20, 2013, Wilmington authorized a transaction by which the ESOP acquired Constellis's stock (the "Transaction"), on terms that Stout assured Wilmington were fair to the ESOP from a financial perspective.

6.      In 2015, a former Constellis employee brought suit against Wilmington alleging that—contrary to Stout's assurances—the ESOP had paid more than fair-market value for Constellis's stock.

7.      The United States District Court for the Eastern District of Virginia conducted a bench trial and found that defects in Stout's work had caused the ESOP to overpay for Constellis's stock by approximately $30 million. *Brundle v. Wilmington Trust N.A.*, 241 F. Supp. 3d 610 (E.D. Va. 2017), *aff'd*, 919 F.3d 763 (4th Cir. 2019).

8.      Although Stout's breaches of the duties it owed to Wilmington, the ESOP, and the ESOP's beneficiaries are the root cause of the $30 million overpayment identified in the *Brundle* decision, Wilmington alone has shouldered the cost of making the ESOP whole.  By this suit, Wilmington seeks to hold Stout accountable for the damage it has caused.

## THE PARTIES

9.      Wilmington is a national banking association organized under federal law with its main office at 1100 North Market Street, Wilmington, Delaware 19890. Wilmington is a wholly owned subsidiary of Wilmington Trust Corporation, headquartered in Wilmington, Delaware. Wilmington Trust Corporation is a wholly owned subsidiary of M&T Bank Corporation, headquartered in Buffalo, New York.

10.     At all times relevant to this action, Stout was a Michigan corporation licensed to do business in the State of New York, with a New York office at 120 West 45th Street, New York, New York 10036.

11.     According to Stout's notice of removal, it has since reorganized itself into a Michigan Limited Liability Company with two members, Stout Holdings I, Inc. and Stout Holdings II, Inc., both Michigan corporations.  (Dkt. 1 ¶¶ 4, 6.)

## JURISDICTION AND VENUE

12.     The Court has personal jurisdiction over Stout because Wilmington's claims arise from Stout's acts within New York, including its transaction of business in New York, its contract to supply services in New York, and its tortious acts in New York.  *See* N.Y. C.P.L.R. § 302(a).

13.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

14.     Venue is proper under 28 U.S.C. § 1391 because Stout resides in this district and a substantial part of the events or omissions giving rise to Wilmington's claims occurred in this district.

## FACTUAL BACKGROUND

**I.     Wilmington's relationship with Stout.**

15.     As noted above, this action arises from Wilmington's service as trustee in connection with the ESOP's purchase of Constellis stock in December 2013.

16.     Stout was and is a nationally known financial-services and valuation firm.

17.     Stout at all times held itself out to Wilmington and the public as a valuation expert with experience and competence in the field of ESOP valuations and transactions.

18.     At the time Wilmington engaged Stout in the Constellis matter, the two had worked together on many prior ESOP transactions.

19.     Wilmington had no reason to question Stout's expertise or reliability.

20.     On October 24, 2013, Stout's New York City office drafted an engagement letter incorporating Stout's Professional Terms, and sent it to Wilmington's New York City office.  (Ex. A.)

21.     Aziz El-Tahch, from Stout's New York City office, signed the Agreement on behalf of Stout.  Representatives of Constellis and Wilmington signed the Agreement on October 24, 2013, and October 25, 2013, respectively.  (*Id.* at 5.)

22.     In the Agreement, Stout promised to "provide certain financial advisory services" to Wilmington in Wilmington's capacity as trustee of the Constellis ESOP.  (*Id.* at 1.)  Among other things, Stout was to "render a written opinion" advising whether "[t]he consideration to be paid by the ESOP for its shares of Company stock pursuant to the terms of the Transaction is not greater than the fair market value (as such term is used for adequate consideration purposes as defined in Section 3(18) of [ERISA]) of such shares."  (*Id.*)

23.     As to Stout's methodology, the Agreement promises that Stout will "consider two forms of the traditional approaches to valuation, including the Income Approach and the Market Approach" and will "use the approach or approaches that in [Stout's] experience and judgment will provide the most supportable valuation."  (*Id.* at 2.)  Stout also promised that "discounts for lack of control and for limited marketability will be applied, if, in [Stout's] judgment, they are appropriate." (*Id.*)

24.     Section 7 of the Professional Terms states, in relevant part: "We warrant that our services will be performed with reasonable care in a professional, diligent, and competent manner and in accordance with our engagement letter."

25. Section 13(f) of the Professional Terms states: "All of our respective rights and duties and all controversies and claims in connection with this engagement will be determined in accordance with the laws of [the] State of New York."

26. The Stout analysts chiefly responsible for the engagement were Scott Levine, from Stout's Virginia office, and El-Tahch.

27. On or about November 12, 2013, El-Tahch and Levine submitted to Wilmington a draft report setting forth Stout's preliminary analyses and opinions concerning the range of fair-market values for Constellis's stock (the "Draft Report").

28. The Draft Report was received by Wilmington representatives in New York, Delaware, and Arizona.

29. Shortly thereafter, El-Tahch and Levine presented Stout's analyses and opinions in a conference call with Wilmington representatives in New York, Delaware, and Arizona.

30. Following Stout's presentation, and in reliance on Stout's advice and opinions, Wilmington began to negotiate terms for the ESOP's purchase of Constellis's stock.

31. Though not provided for in the Agreement, Stout directly participated in those negotiations. Its work in this regard included re-assessing the potential transaction as deal terms evolved, reviewing deal documents, and providing real-time counsel and advice.

32. In the course of providing counsel and advice during negotiations, Stout restated, endorsed, and elaborated on its analyses and opinions.

33. At the conclusion of negotiations, and in reliance on Stout's advice and opinions, Wilmington tentatively agreed to terms for the ESOP's purchase of Constellis's stock.

34. The proposed purchase price fell within the range of fair-market values stated in the Draft Report.

35.     On or about December 18, 2013, El-Tahch and Levine submitted to Wilmington Stout's final valuation (the "Final Report") and fairness opinion regarding the deal terms to which Wilmington had tentatively agreed.

36.     The Final Report and fairness opinion were received by Wilmington representatives in New York, Delaware, and Arizona.

37.     Shortly thereafter, El-Tahch and Levine presented Stout's final opinions and analyses in a conference call with Wilmington representatives in New York, Delaware, and Arizona.

38.     Following Stout's presentation, and in reliance on Stout's analyses and opinions, Wilmington approved the Transaction.

39.     The Transaction closed on December 20, 2013.

40.     From the outset of Stout's engagement, Wilmington acted in reliance on Stout's superior expertise, knowledge, and experience; its relationship of trust with Stout; and Stout's contractual commitments to use appropriate valuation methodologies (Ex. A at 2), to appropriately assess control and marketability factors (*id.*), and to perform its services "with reasonable care in a professional, diligent, and competent manner" (*id.*, Professional Terms § 7).

41.     In all of its interactions with Wilmington, Stout knew that it was under a duty to act and give advice for the benefit of Wilmington, the ESOP, and the ESOP's beneficiaries.

42.     Stout intended for Wilmington (and, through Wilmington, the ESOP and the ESOP's beneficiaries) to rely upon its opinions and advice.

43.     Wilmington (and, through Wilmington, the ESOP and the ESOP's beneficiaries) did in fact rely on Stout's opinions and advice, and their reliance was reasonable given Stout's superior knowledge and expertise.

II.     **The *Brundle* litigation.**

44.     Many months after the Transaction closed, a former Constellis employee and ESOP participant named Tim P. Brundle brought an action—*Brundle v. Wilmington Trust N.A.*, No. 15-cv-01494 (E.D. Va.)—alleging that Wilmington caused the ESOP to enter into a transaction prohibited under 29 U.S.C. § 1106.

45.     Wilmington raised the defense available under 29 U.S.C. § 1108(e), which would apply if, as relevant here, the ESOP paid no more than fair-market value for Constellis's stock.

46.     Brundle contended that the ESOP had overpaid for Constellis's stock.

47.     Stout, for its part, maintained to Wilmington that its work was appropriate and reasonable, and that Brundle's allegations were meritless.

48.     Wilmington did not suspect, and had no cause to suspect, that Stout's work was deficient.

49.     Wilmington's position in the *Brundle* litigation was that Stout's valuation was appropriate and the ESOP did not pay more than fair-market value for Constellis's stock.

50.     Throughout the *Brundle* litigation, Stout worked side-by-side with Wilmington to defend its valuation.

51.     At trial, Stout's Aziz El-Tahch testified at length in defense of Stout's work.

52.     On March 13, 2017, after conducting a bench trial, the district court issued factual findings regarding Stout's valuation work and Wilmington's performance as trustee.

53.     Findings made by the *Brundle* court are set forth below.  These findings are binding on Stout or, in the alternative, Wilmington will establish them at trial.

### a. Constellis initiates an ESOP restructuring.

54.     Constellis was a closely held private-security company.  *See Brundle*, 241 F. Supp. 3d at 614.

55.     In 2012, a private-equity firm named Vestar Capital Partners ("Vestar") considered purchasing Constellis, but the deal fell through.  *Id.* at 614-15.

56.     In mid-2013, Constellis's shareholders (the "shareholders") began exploring the possibility of forming an ESOP.  *Id.* at 615.

57.     Constellis retained CSG International ("CSG"), an investment-banking firm, to advise it on the prospect of forming an ESOP.  *Id.*

58.     CSG's proposal provided that stock purchased by the ESOP would be held in trust and allocated to employees over time.  *Id.* at 614.

59.     Under CSG's proposal, the shareholders would sell 90% of their shares to the ESOP and exchange the remaining 10% for equity-like warrants.  These warrants would entitle the shareholders to buy back equity in Constellis at a designated price, and allow them to appoint a majority of Constellis's board of directors.  *Id.* at 615-16.

60.     In September 2013, Constellis decided to move forward with CSG's proposal.  *Id.* at 616.

### b. The ESOP transaction.

61.     Constellis engaged Wilmington to serve as ESOP trustee.  *Id.*

62.     To carry out its duties, Wilmington needed a financial advisor, and it chose Stout. *Id.* at 617.

63.     Stout had extensive ESOP experience and had been on Wilmington's list of approved financial advisors since 2009.  *Id.*

64.     As of 2013, Stout had provided valuation and advisory services to every major institutional ESOP trustee in the United States.  *Id.*

65.     Stout analyst Scott Levine was a Certified Public Accountant, Accredited in Business Valuation, a Chartered Financial Analyst, and an Accredited Senior Appraiser.  In his 18 years of experience, he had performed roughly 1,500 ESOP valuations.  *Id.*

66.     Stout analyst Aziz El-Tahch was a Chartered Financial Analyst.  In his 12 years of experience, he had conducted roughly 750 ESOP valuations.  *Id.*

67.     El-Tahch and Levine produced the Draft Report, dated November 14, 2013, which concluded that the fair-market value of a single share of Constellis stock, on a controlling-interest basis, was between $3,865 and $4,600.  *Id.* at 619, 621.

68.     On November 14, 2013, Stout presented the Draft Report's analyses and conclusions to Wilmington.  *Id.* at 621-22.

69.     After the meeting, and based on Stout's opinions and analyses, Wilmington, its counsel, and Stout began to negotiate the terms of the Transaction.  *Id.* at 622.

70.     By November 22, 2013, Wilmington, its counsel, and Stout had negotiated a per-share price of $4,235, along with terms concerning financing, control, and retention of management.  *Id.* at 623-24.

71.     Stout's Final Report and fairness opinion concluded that the agreed-upon purchase price was not greater than fair-market value, and that the terms of the Transaction, taken as a whole, were fair to the ESOP from a financial point of view.  *Id.* at 625.

72.     Stout presented its final conclusions and analyses to Wilmington on December 19, 2013.  *Id.*

73.     Following this presentation, Wilmington approved the purchase of Constellis's

stock. *Id.*

74.    The Transaction closed on December 20, 2013. *Id.*

     **c.  Damages attributed to Stout's work.**

75.    The *Brundle* court found that Stout's valuation was not consistent with fair-market value. *Id.* at 643-44, 646-50.

76.    The court supported its conclusion by citing specific defects in Stout's work.

77.    <u>The Company's representations and projections:</u>

    a.  Stout unreasonably relied on Constellis management's financial representations and projections despite several red flags that were known or should have been known to Stout at the time. *Id.* at 636, 646.

    b.  First, management would receive a cash bonus of 5% of the total purchase price, which created an incentive for management to inflate the projections provided to Stout. *Id.* at 636.

    c.  Second, management was eligible to receive stock-appreciation rights ("SARs") that were tied to the Company's equity value, again giving management an incentive to inflate projections. *Id.*

    d.  Third, an audit regarding $62 million in overbilling had the potential to cause a liquidity crisis at Constellis, and cast doubts on the Company's record-keeping. *Id.*

    e.  Fourth, much of Constellis's revenue derived from two contracts. *Id.* at 637.

    f.  Fifth, Constellis had issued multiple sets of projections over the previous year, including inflated projections prepared in relation to the unsuccessful Vestar buyout. *Id.* at 638. Stout knew of, but withheld from Wilmington, the fact that

Constellis issued more aggressive projections for the Vestar transaction to put the company in a better light. *Id.* at 621 n.14. Stout nevertheless used the Vestar offer based on these more aggressive projections to support its valuation. *Id.*

g.  Sixth, Constellis did not adequately explain how or whether two pending acquisitions would benefit the Company. *Id.* at 638.

78.  <u>Risk assessment:</u>

a.  Beta is a measure designed to capture the risk of an industry relative to the risk of the market overall. *See Brundle v. Wilmington Trust, N.A.*, 258 F. Supp. 3d 647, 658 (E.D. Va. 2017).

b.  In performing its valuation, Stout used a beta that would be appropriate for an industry that is less risky than the market as a whole, whereas government contracting is not less risky than the market as a whole. *Id.* at 662-63.

c.  Stout also failed to properly account for Constellis's risk relative to other members of its industry. *Brundle*, 241 F. Supp. 3d at 646-47.

79.  <u>Control premium and discount for lack of control:</u>

a.  The structure of the Transaction meant that the ESOP could not exercise certain prerogatives of control over Constellis. *Id.* at 625-27, 638.

b.  Nevertheless, Stout unreasonably applied a 10% control premium in one of its analyses, and failed to apply a lack-of-control discount in the other. *Id.* at 638-39, 647.

80.  <u>Rounding up:</u>

a.  Stout unreasonably rounded up to approximate values. *Id.* at 639-40, 648.

      b.  For example, in the Draft Report, Stout reported the median per-share value as $4,235, when in fact it was $4,232.50. *Id.* at 639.

81.  <u>Stock Appreciation Rights:</u>

      a.  The Transaction contemplated that management would receive SARs. *Id.* at 623.

      b.  Stout unreasonably failed to deduct the value of the SARs when calculating the Company's equity value. *Id.* at 648.

82.  The *Brundle* court found that, all told, Stout's errors caused the ESOP to overpay for the Constellis stock by $29,773,250. *Id.* at 648.

83.  The court's opinion includes the following table itemizing Stout's errors and the corresponding damage to the ESOP:

| Item | Court's Findings of Impact on Price |
|---|---|
| Reliance on Management's Growth Projections | $4,325,000 |
| Use of 0.7 Beta | $2,936,000 |
| Use of 1.0 Company Specific Risk Factor | $0 |
| Use of 3% Perpetual Growth Rate | $0 |
| Weighting of DCF to GCM | $0 |
| Inclusion of Control Premium | $8,186,000 |
| Failure to Include Lack of Control Discount | $9,715,250 |
| Comparable Company Discount | $0 |
| Stock Appreciation Rights | $1,611,000 |
| Rounding | $3,000,000 |
| Total Damages | $29,773,250 |

*Id.*

84.  Wilmington was liable for Stout's errors, the court held, because it had not "thoroughly probed the gaps and internal inconsistencies in [Stout's] report." *Id.* at 634.

### III.   Wilmington satisfies the entirety of the *Brundle* judgment.

85.   On March 13, 2017, the *Brundle* court entered judgment against Wilmington in the amount of $29,773,250 (the "Judgment").  *Brundle*, ECF No. 297.

86.   On March 22, 2019, the United States Court of Appeals for the Fourth Circuit affirmed the district court in all respects.  *Brundle*, 919 F.3d at 788.

87.   By August 23, 2019, Wilmington had fully satisfied the Judgment.  *Brundle*, ECF No. 451.

88.   Stout has not paid any sum toward satisfaction of the Judgment.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

89.   Wilmington repeats and realleges each of the allegations stated above as if fully set forth herein.

90.   Wilmington and Stout formed a contract on October 25, 2013, when Wilmington executed the Agreement, which had been signed by Stout and Constellis on October 24, 2013. (Ex. A at 5.)

91.   The Agreement is valid and enforceable.

92.   Wilmington and Constellis performed their obligations under the Agreement and Stout was paid in full.

93.   Under the Agreement, Stout promised to use appropriate methodologies in reaching a valuation opinion on which Wilmington could rely in carrying out its duties as trustee.  (*Id.* at 1-2.)  Stout further promised that its services would be "performed with reasonable care in a professional, diligent, and competent manner."  (*Id.*, Professional Terms § 7.)

94.   Stout materially breached these and other contractual obligations through various unreasonable and unjustified failures, including, but not limited to:

- 13 -

a.  unreasonably relying on the Company's financial representations and projections;

b.  improperly assessing industry and company risks;

c.  applying a control premium and failing to apply a lack-of-control discount;

d.  rounding up various figures in its calculations; and

e.  failing to deduct the value of management's SARs from the Company's equity value.

95.  Stout's material breaches resulted from a lack of due care and failure to adhere to reasonable professional standards.

96.  Stout's material breaches prevented Wilmington from fulfilling its own obligations to the ESOP and its beneficiaries.

97.  Stout's material breaches caused Wilmington to incur at least $29,773,250 in reasonably foreseeable damages.

98.  Specifically, Stout's breach resulted in the $29,773,250 *Brundle* Judgment being entered against Wilmington, and it also caused Wilmington to incur attorneys' fees to defend against the claims in the *Brundle* litigation.

99.  Wilmington would not have incurred these damages absent Stout's breaches of the Agreement.

## SECOND CAUSE OF ACTION
## (NEGLIGENCE)

100.  Wilmington repeats and realleges each of the allegations stated above as if fully set forth herein.

101.    Stout's relationship with Wilmington called for Stout to apply its financial, valuation, and strategic expertise for the benefit of Wilmington, the ESOP, and the ESOP's beneficiaries.

102.    Stout owed Wilmington a duty of reasonable care and a fiduciary duty.

103.    Stout also owed duties of care to the ESOP and its beneficiaries because Stout knew, based on Wilmington's status as ESOP trustee, that its services were primarily intended to benefit the ESOP and its beneficiaries.

104.    Stout intended that, as ESOP trustee, Wilmington (and, through Wilmington, the ESOP and the ESOP's beneficiaries) would rely upon Stout's opinions and advice.

105.    Wilmington (and, through Wilmington, the ESOP and the ESOP's beneficiaries) did in fact rely on Stout's opinions and advice, and their reliance was reasonable given Stout's superior knowledge and expertise.

106.    Wilmington also trusted Stout to faithfully and competently represent its interests, and those of the ESOP and the ESOP's beneficiaries, during the negotiations over the terms of the Transaction.

107.    As an ESOP-valuation expert, Stout was obliged to perform its work as would a reasonably prudent ESOP-valuation professional.

108.    Stout breached its duties through various unreasonable and unjustified failures, including, but not limited to:

   a.   unreasonably relying on the Company's financial representations and projections;

   b.   improperly assessing industry and company risks;

   c.   applying a control premium and failing to apply a lack-of-control discount;

    d.   rounding up various figures in its calculations; and

    e.   failing to deduct the value of management's SARs from the Company's equity value.

109.    These errors manifested themselves not only in the opinions and analyses that Stout issued as required by the parties' Agreement, but also in the advice and counsel that Stout rendered during negotiations over the Transaction's terms.

110.    Stout's failures cumulatively fell below the level of performance and standard of care that Stout owed to Wilmington, the ESOP, and the ESOP's beneficiaries.

111.    Stout's material breaches of its duties prevented Wilmington from fulfilling its own obligations to the ESOP and its beneficiaries.

112.    Stout's material breaches caused Wilmington to incur at least $29,773,250 in reasonably foreseeable damages.

113.    Specifically, Stout's breach resulted in the $29,773,250 *Brundle* Judgment being entered against Wilmington, and it also caused Wilmington to incur attorneys' fees to defend against the claims in the *Brundle* litigation.

114.    Wilmington would not have incurred these damages absent Stout's breaches.

### THIRD CAUSE OF ACTION
### (CONTRIBUTION)

115.    Wilmington repeats and realleges each of the allegations stated above as if fully set forth herein.

116.    Stout owed duties of care, fiduciary duties, and contractual duties to Wilmington.

117.    Stout also owed contractual duties and duties of care to the ESOP and the ESOP's beneficiaries.

118.    Stout intended that, as ESOP trustee, Wilmington (and, through Wilmington, the ESOP and the ESOP's beneficiaries) would rely on Stout's opinions and advice.

119.    Wilmington (and, through Wilmington, the ESOP and the ESOP's beneficiaries) did in fact rely on Stout's opinions and advice, and their reliance was reasonable given Stout's superior knowledge and expertise.

120.    Wilmington also trusted Stout to faithfully and competently represent its interests, and those of the ESOP and the ESOP's beneficiaries, during the negotiations over the terms of the Transaction.

121.    As an ESOP-valuation expert, Stout was obliged to perform its work as would a reasonably prudent ESOP-valuation professional.

122.    Stout breached its duties through various unreasonable and unjustified failures, including, but not limited to:

> a.  unreasonably relying on the Company's financial representations and projections;
>
> b.  improperly assessing industry and company risks;
>
> c.  applying a control premium and failing to apply a lack-of-control discount;
>
> d.  rounding up various figures in its calculations; and
>
> e.  failing to deduct the value of management's SARs from the Company's equity value.

123.    These errors manifested themselves not only in the opinions and analyses that Stout issued as required by the parties' Agreement, but also in the advice and counsel that Stout rendered during negotiations over the Transaction's terms.

124.    Stout's failures cumulatively fell below the level of performance and standard of care that Stout owed to Wilmington, the ESOP, and the ESOP's beneficiaries.

125.    Stout's material breaches of its duties prevented Wilmington from fulfilling its own obligations to the ESOP and its beneficiaries.

126.    Wilmington and Stout jointly contributed to the same injury—namely, the ESOP's overpayment for Constellis's stock.

127.    Wilmington paid greater than its equitable share of the ESOP's overpayment when it satisfied the entire *Brundle* Judgment.

128.    Stout has not paid any portion of the Judgment.

129.    Wilmington demands, pursuant to N.Y. C.P.L.R. §§ 1401-1404, that Stout pay its equitable share of the Judgment.

## DEMAND FOR A JURY TRIAL

130.    On all issues and all causes of action, Wilmington demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wilmington Trust, N.A. respectfully requests the following relief:

(a)    On the breach-of-contract cause of action, that the Court enter judgment in favor of Wilmington against Stout in the amount of at least $29,773,250;

(b)    On the negligence cause of action, that the Court enter judgment in favor of Wilmington against Stout in the amount of at least $29,773,250;

(c)    On the contribution cause of action, that the Court enter judgment in favor of Wilmington against Stout in an amount to be established at trial (in any event, greater than $500,000) that reflects Stout's equitable share of the $29,773,250 *Brundle* Judgment;

- 18 -

(d)     That the Court award pre-judgment interest, costs, and disbursements;

(e)     That the Court award attorneys' fees to the extent permitted by law; and

(f)     That the Court grant such other and further relief as the Court may deem just and

proper.

Dated: Buffalo, New York
       June 22, 2020

                                        **HODGSON RUSS** LLP
                                        *Attorneys for Wilmington Trust, N.A.*

                                        By /s/Daniel C. Oliverio
                                             Daniel C. Oliverio
                                             Spencer L. Durland
                                        The Guaranty Building
                                        140 Pearl Street, Suite 100
                                        Buffalo, New York 14202-4040
                                        Telephone:  (716) 856-4000
                                        *doliverio@hodgsonruss.com*
                                        *sdurland@hodgsonruss.com*